THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BENJAMIN BUNDY *et al.* Plaintiffs in Error.

*Opinion filed December 23, 1926—Rehearing denied Feb. 3, 1927.*

1. CRIMINAL LAW—*when indictment sufficiently charges place of commission of larceny.* An indictment charging that defendants stole property in one county and carried it into another is sufficient to charge larceny in the latter county. (*People* v. *Flynn,* 302 Ill. 549, followed.)

2. SAME—*what instructions do not mislead jury on question of guilt·of larceny.* In a prosecution for larceny of pigs, where the defendants admit having stolen pigs but claim that they were not the pigs of the party named in the indictment, instructions that the presumption of innocence is "not intended to aid anyone who is in fact guilty of crime to escape," that possession of stolen property soon after a theft tends to establish guilt, and a simple instruction as to the form of verdict, are not improper as tending to authorize a conviction of larceny regardless of whose pigs were taken, where other instructions clearly advise the jury that they must find the defendants guilty of larceny of the pigs of the party named in the indictment.

3. SAME—*when failure to charge jury to find value of property taken is not prejudicial.* In a prosecution for larceny the fact that an instruction directs a verdict without charging the jury to find the value of the property taken is not prejudicial, where the jury by their verdict find the value of the property to be that charged in the indictment and where the evidence shows such to be the value of the property.

4. SAME—*instructions should be taken as a series.* All the instructions given by the court should be considered as a series and as constituting a single charge to the jury, and error cannot be predicated on a single instruction or sentence or paragraph thereof, where all the instructions, taken together, cover all the rules of law applicable and proper in determining the question of guilt.

WRIT OF ERROR to the Circuit Court of Hancock county; the Hon. WILLIS F. GRAHAM, Judge, presiding.

HARTZELL, CAVANAGH & MARTIN, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, HOMER H. WILLIAMS, State's Attorney, and HARLINGTON WOOD, (R. B. O'HARRA, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

An indictment was returned by the grand jury at the October term, 1925, of the circuit court of Hancock county against Benjamin Bundy, Archibald Collins and Clarence Ketcham, charging them with the larceny on June 4, 1925, in McDonough county, of nine Duroc pigs of the value of $45, the property of Jesse Carnes, and with feloniously carrying them into Hancock county. The case was tried · at the March term, 1926, and the defendants were convicted and sentenced to imprisonment in the penitentiary as provided by the statute. They have sued out this writ of error and allege error in that the verdict is not sustained by the evidence, that the indictment does not charge the commission of a crime in Hancock county, and that the court erred in instructing the jury.

As to the indictment, it is said that the only offense charged, other than larceny in McDonough county, is that the defendants feloniously carried the pigs into the county of Hancock, and there is no statute making it a crime to carry property from one county to another; that under an indictment containing proper allegations the defendants could be prosecuted in Hancock county for larceny of property in McDonough county provided they carried the property into Hancock county and it was there found, but that in such case the indictment should allege that the defendants committed the crime of larceny in Hancock county. An indictment containing the same allegations as in this case, that the defendant stole the property in one county and carried it into another, was held sufficient to charge larceny in the latter county, in *People* v. *Flynn,* 302 Ill. 549.

On June 1, 1925, Jesse Carnes was living on a farm in McDonough county four and a half miles northeast of

LaHarpe, which is in Hancock county. He testified that on June 3 he had fifty-five small pigs and on the Saturday following he discovered that he had lost nine pigs. He was not at home the evening of June 4. Later he saw and identified nine pigs which were in LaHarpe, four in the possession of Archie Collins, two in the possession of Ben Bundy and three in the possession of Amos Bundy, who had bought them from Ben Bundy. Carnes replevied the pigs and took them home. The evidence justified the conclusion that Carnes' pigs were stolen, and it is not contended that they were not, but it is argued that the pigs taken under the writ of replevin were not his pigs but were pigs of Faye Thompson and Dave Davis which were stolen by the defendants from a farm in Hancock county three and a half miles west of Colusa, in Hancock county, belonging to Davis and occupied by Thompson, his tenant, who farmed the place and raised stock under a contract of joint ownership with Davis. Ketcham and Bundy testified that the three defendants stole the pigs from Thompson and Davis on three different nights,—Sunday, May 31, Tuesday, June 2, and Wednesday, June 3,—each taking one pig each time, and that they never took any pigs from Carnes. Collins did not testify.

Besides Carnes' testimony of the loss of his pigs after June 3, Bert Cass, his uncle, testified that he lived in La-Harpe on the southwest corner of the same block in which Ben Bundy lived on the northeast corner; that in the early evening of June 4, 1925, he saw the defendants sitting on a bench in front of the pool-room and heard one of them say, "Well, do you want to go snipe hunting?" and another answered, "Yes; I want to go hunting but you aren't going to get me to hold the sack," to which the first replied, "I don't mean snipes; I mean snipe pigs." Bundy and Collins got up and went away and then came back in a two-seated Ford car, Bundy driving. They called Ketcham, who got in the back seat, and they drove off. Cass saw the de-

fendants again the same night about twelve o'clock when they drove up to Bundy's house under the street light, Bundy driving, Ketcham in the front seat with him and Collins behind. They drove in, each one took a pig and put it in the pen, and one went back and got another pig. Cass was then standing against a small plum tree a few feet away. They then went out to the street, headed the car west and Cass did not see the car any more. Collins lived about six blocks north of Bundy's place. Cass walked over there and across to Collins' pig pen and there were five pigs in the corner. To make sure he stooped over, picked them up and counted them and then went home and to bed.

I. N. Mealey, a farmer living a mile west of LaHarpe, was in Blandinsville, in McDonough county, six or seven miles east of LaHarpe, with his wife, the same night, June 4, and then came back about ten or eleven o'clock. There are two roads between Blandinsville and LaHarpe, and they came back the north road, which ·passes Carnes' place. On the way, about two miles east of LaHarpe, they passed Bundy and Ketcham in a Ford touring car, going in the same direction. Bundy was driving and Ketcham in the front seat, but Mealey could not testify as to whether there was anyone in the back seat or not.

Carnes positively identified the pigs as his and was corroborated in his identification by John Newhart, a neighbor just across the road, who had helped him with his pigs during the spring. He testified that they were Carnes' pigs, and testified that when released they "took up with their mothers and sucked the sows just as though there had nothing happened."

Against this evidence were the denials of two of the defendants that they stole any pigs from Carnes and their testimony that they stole from Thompson and Davis the pigs which Carnes claimed. Thompson testified that he counted his pigs about June 1 and had fifty-eight,—all red Durocs. On Sunday, June 14, the defendants came to him

on his place and after talking to them he counted his pigs and had forty-nine. He went to LaHarpe and saw there the nine pigs which were replevied. They looked like his pigs and were the same size and color. His pigs would weigh thirty-five or forty pounds. The pigs Carnes had at his place were smaller and would weigh from twenty to thirty pounds, and the pigs which Thompson saw in town would weigh from thirty-five to forty pounds. Davis testified that he only knew the pigs they had as Thompson reported them. He never had anything to do with the pigs himself. Thompson and Davis both testified that there are two types of Durocs,—the large and the small,—which differ in appearance; that theirs were of the large type and those which Carnes had were of the small type. Both said that they could not say that these nine pigs were theirs; that they did not know.

Carnes in his testimony stated that the pigs would weigh twenty-five or thirty pounds,—average about twenty-five pounds,—and on cross-examination said that he was guessing at the weight, and that after his attention was called to it he would stick to it that the weight of his pigs which were taken was twenty or twenty-five pounds. Earnest Carnes, Jesse's brother, who had worked for him in 1925, saw the pigs before June 4 and had gone with the constable who served the replevin writ, testified that the largest pig he saw there would weigh about forty pounds and the smallest about thirty-five pounds, and in his judgment his brother had no pigs which would weigh from twenty to twenty-five pounds. The evidence was contradictory, but it was for the jury to reconcile, if possible, and if not, to determine what was the truth. We cannot say that the evidence leaves a reasonable doubt of the defendants' guilt, as we must say to justify a reversal of the judgment on the ground that the evidence does not sustain the verdict.

It is contended that the case is of such a character, under the evidence, as to require that the instructions should

be strictly accurate, and that the sixth instruction, which is a cautionary instruction on the presumption of innocence which has been frequently given at the request of the prosecution, states the law incorrectly under the facts of this case.  It is as follows:

"The court instructs the jury as a matter of law that the rule which clothes every person accused of crime with the presumption of innocence, and imposes upon the State the burden of establishing his guilt beyond a reasonable doubt, is not intended to aid anyone who is in fact guilty of crime to escape, but is a humane provision of the law intended, as far as human agencies can, to prevent an innocent person from being convicted."

The argument is that the defense being that the defendants having stolen the pigs from Thompson and Davis were guilty of the crime of larceny but not of the crime charged, and the jury, believing them guilty of the one crime, would by the instruction feel relieved of the obligation to give them the benefit of the presumption of innocence of the crime with which they were charged.  There is no foundation for the apprehension that such a misunderstanding might arise. The jury were carefully guarded against any such mistake and the rights of the defendants fully protected.  The third instruction for the defendants told the jury that the defendants were not required to prove themselves innocent but at the commencement of the trial are presumed to be innocent, and that in considering the testimony the jury must look at it in the light of that presumption, which abides with them throughout the trial of the case until convinced by the evidence to the contrary beyond a reasonable doubt.  The seventh instruction further told the jury that the presumption of innocence is not a mere form, to be disregarded by the jury at pleasure, but an essential, substantial part of the law of the land and binding on the jury, and it is the duty of the jury to give the defendants the full benefit of the presumption and acquit them unless convinced of their guilt

beyond all reasonable doubt. Moreover, in two other instructions given at the request of the defendants the jury were expressly told that one of the material questions in the case is whether or not the pigs in question are the identical pigs claimed to have been stolen, and the burden of proof is on the prosecution to prove, beyond a reasonable doubt, the identity of the pigs as being those claimed to have been stolen from Jesse Carnes, the prosecuting witness; and again, that under the indictment in this case the jury should only determine and decide the question as to whether or not the defendants are guilty of the larceny of the pigs of Carnes, and they have no right to find the defendants guilty because they may believe from the evidence in the case that they are guilty of the larceny of pigs which were the property of some other person than Carnes. It must be presumed that the jurors had the degree of intelligence required to understand these instructions, which plainly told them that the defendants could not be convicted unless it was proved, beyond a reasonable doubt, that the pigs stolen were the property of Carnes, and therefore they could not have ignorantly made the mistake of finding the defendants guilty because they had stolen the pigs of Thompson and Davis.

Objection is made to instruction No. 3 for the reason that it leaves out one element of the crime to constitute larceny,—the value of the property alleged to have been stolen. Instruction No. 3 has no reference to the elements necessary to constitute larceny, and the criticism was doubtless directed against instruction No. 4, which is, that if the jury believe from the evidence, beyond a reasonable doubt, that the defendants stole the nine pigs in question in McDonough county and brought them into Hancock county, and that said pigs were the property of Jesse Carnes, then they should find the defendants guilty. The instruction is erroneous in failing to require the jury to find the value of the stolen property, but the jury corrected the oversight of

the court and counsel by finding in their verdict the value of the property to be $45. The indictment charges the value of the property to be $45, the evidence shows its value was $45 and the jury found such value by their verdict to be $45, so that the failure of the court to charge the jury that it was necessary to find the value was in no respect prejudicial to the defendants.

Instruction No. 11 told the jury that the possession of stolen property soon after a theft tends to establish the guilt of the person in whose possession the property is found, and is sufficient to authorize a conviction unless the inference of guilt thereby raised is overcome by other facts and circumstances in evidence which create in the minds of the jury a reasonable doubt of such guilt. It is contended that the instruction was erroneous because it authorized the conviction even though the jury found the title to the pigs in question to have been in Thompson and Davis and the pigs to have been stolen from Thompson and Davis. In view of the two instructions given for the defendants which have just been mentioned and which plainly told the jury that proof of the ownership of the pigs by Jesse Carnes was essential to a conviction, there is no basis for this contention. The instructions must be taken as a series and all considered together, and when this is done there is no basis for the apprehension expressed in the brief that if the jury found all the issues of fact as contended for by the defendants, still they were authorized by the instruction to find them guilty of larceny of the pigs the property of Carnes even though they found the pigs in question were the property of Thompson and Davis.

Instruction No. 12 given at the request of the People was as follows:

"The court instructs the jury that although there may be some evidence in this case that the nine hogs in question were not the property of Jesse Carnes, still this alone is not sufficient to acquit the defendants unless such evi-

dence is sufficient to raise in the minds of the jury a reasonable doubt that said hogs were owned by said Jesse Carnes."

The objection made to it is that it assumes that the property is in Carnes and casts on the defendants the burden of raising a doubt as to Carnes' ownership, and that the jury would get the impression from it that the court thought there was no question as to the ownership of the property. As the issue was presented on the trial the principal question in the case was the ownership of the pigs,—whether in Carnes or Thompson and Davis. There was evidence on both sides of this issue. The object of the instruction was to give the jury rules of law applicable to the evidence so that the jury might apply them to the facts in the case, and the instructions were all directed to that end and were all to be considered with that purpose in view. In the determination of the issue, as was plainly explained to the jury as heretofore indicated, the burden was on the prosecution to prove, beyond a reasonable doubt, the ownership of Carnes, and the defendants could not be found guilty even though the jury might believe from the evidence they were guilty of the larceny of the pigs of some other person. Instruction No. 12 did no more than tell the jury that evidence that the nine pigs in question were not the property of Carnes was not sufficient to justify an acquittal unless there was sufficient evidence to raise in the minds of the jury a reasonable doubt that the pigs were owned by Carnes. Objection is also made to the use of the expression "there may be some evidence," etc., as referring in a slighting manner to the testimony relative to the ownership of the pigs in question by Thompson and Davis, and giving the jury to understand that there is sufficient proof of the ownership of the pigs in Carnes unless a reasonable doubt is raised in their minds by the evidence. The instruction is to be read in the light of the other instructions in the case, which told the jury that the indictment was not to be considered by the jury as any evidence against the defend-

ants; that the burden of proof rested upon the prosecution to make out and prove to the satisfaction of the jury, beyond all reasonable doubt, every material allegation of the indictment; that mere probability was not sufficient to warrant a conviction, nor was it sufficient that the greater weight or preponderance of the evidence supports the allegations of the indictment; that before the jury could convict the defendants they must be satisfied to a moral certainty not only that the proof is consistent with the defendants' guilt but that it is wholly inconsistent with every other rational conclusion; that the jury were the sole judges of the facts in the case and the credit to be given to the respective witnesses who testified, and that the defendants Ketcham and Bundy were competent witnesses in their own behalf, and the jury had no right to discredit their testimony from mere caprice but were to treat them the same as other witnesses and subject them to the same tests, and only the same tests, as were legally applied to other witnesses, and that while the defendant Collins might have testified in his own behalf he was under no obligation to do so, and the statutes expressly declare that his neglect to testify should not create any presumption against him, and that it was the duty of the jury to follow the statutes. The instruction, in connection with all the instructions in the case, was not prejudicial to the defendants.

In instructing the jury as to the form of the verdict the court stated: "If you find all the defendants guilty of larceny the form of your verdict may be as follows:"—giving the form of the verdict. It is insisted that this instruction was, in effect, a direction to find the defendants guilty because it was not limited to the larceny of any pigs from Carnes but extends to any larceny. This verdict did not undertake to lay down any rule of law for the guidance of the jury in arriving at their verdict of guilty or not guilty. It purported to be only as to the form of the verdict. The other instructions which were given covered all the rules

of law applicable to the case for the jury in determining whether the defendants were guilty or not. All the instructions given by the court, taken together, constituted a single charge to the jury. Error cannot be predicated upon such a charge by the selection of particular sentences or paragraphs and reading them separated from other portions of the charge which modify and explain them. In this case the jury had clear instructions as to the issue before them and as to the particular part of that issue about which there was the most vigorous contest at the trial. We have considered all the objections made to the charge and find no prejudicial error in it.

The judgment is affirmed.        *Judgment affirmed.*